## BARKER *v.* HAWLEY.

It has been repeatedly held by this court that where the evidence is conflicting and the verdict is not manifestly against the weight of evidence, the verdict will not be disturbed. This court must assume the truth to be with the evidence which upholds the verdict. It is not enough that, had the verdict been different, this court would not have disturbed it.

### *Appeal from District Court of Gilpin County.*

THE plaintiff, to maintain the issues upon his part, introduced himself as a witness, and testified as follows :.

"I am the plaintiff in this suit. (Here the instrument sued upon is shown to the witness.) I have seen this instrument before; it was made by William J. Barker, the defendant in this suit. I have made a demand on him for the money some time in April or May, 1868, soon after I went into business with Mr. Lake. I told him, Barker, that I was hard up, paying three per cent per month for money ; that I ought to have the money or the same rate of interest on it; he told me he would allow me ten per cent. I made a memorandum of the time and date of the conversation, and put it in the agreement, stating in pencil that it was drawing ten per cent from date. I do not know what became of the memorandum. He made no objection to paying principal; said he would allow ten per cent interest."

*Cross-examination :* "This conversation occurred in Black Hawk. I think no one was present except ourselves ; at least no one that I know of. It was at his place of business ; grain and feed business ; I think the conversation occurred indoors ; I told him I was in need of money, and paying large interest myself. I suppose he would be bound to pay ten per cent interest ; he did not, I think, fix a definite time to pay principal. Do not know when we talked next, as late, I think, as 1870 ; two or three years intervened between the first and next conversation. I told him I was paying three per cent per month, and was hard up.

The agreement is in defendant's handwriting; he acknowledged it at different times. In September, 1873, I think, I had a conversation with defendant in Denver about this. I made a memorandum to fix date to collect interest; the conversation was in his store; I cannot recollect it all; I made demand for the money; he asked me why I had not made demand before; I think I told him in plain words that I did not think I could collect it. I did not think that the defendant was insolvent; I did not think I could make it on execution; think I can now. He lived at Black Hawk, and I at Central. There was no agreement after this; there is a verbal agreement that if I would send Mr. Schellenger to Black Hawk, and Barker executed a deed to me for certain property, I would give him a certain note. Mr. Schellenger did not bring back the deed; I sent him down there; Schellenger prepared the deed; I suppose I gave instructions regarding the deed; my recollection is not very clear, but I tried to get some property back that I sold, being the undivided one-sixth of three hundred feet of the Dorchester lode; may be the claims five, six and seven east; I am not certain, though. The amount was $1,136; $1,000 was on account of the purchase of the property, and $136 for work on the same. Barker had just got back from the east. I don't remember a conversation about the time he went to Denver; Barker told me he was trying to sell the property."

*Re-direct examination:* "I don't know that he ever promised to pay it; he only promised to pay interest; never denied or refused to pay it."

Plaintiff then offered in evidence the paper sued on (see dissenting opinion of Justice STONE, *post*). To the introduction of which in evidence the defendant objected, but the court overruled the objection, and the defendant, by his counsel, then and there excepted.

Thereupon the said plaintiff was recalled and testified:

"In 1867 I had a conversation with Barker regarding this instrument; I wanted to know what he was going to do

about it; he said he would pay me something on it. I believe he offered to pay at one time; said he would pay me $800."

*Cross-examination:* "This was soon after it was due, in 1867 sometime. In 1867 I think he had given up trying to sell the property. I told him I would not take $800; I told him I would take the property back if he would deed it to me, but don't know that it was the same conversation. I made memorandum to fix time for interest to commence. Think I had other conversations; I did not testify to this conversation this morning."

*Re-direct examination:* "Mr. Butler gave me advice."
Thereupon the plaintiff rested.

The defendant, to maintain the issues upon his part, gave in evidence the deposition of Frank A. Burnell, who testified: "That he was twenty-six years of age; occupation, a clerk; knows the parties to this suit; have known H. J. Hawley for four years, and has known the defendant for the same length of time. I heard a conversation between Hawley and Barker; it occurred in Barker's store in Denver, at 155 Fifteenth street. Mr. Hawley said to Mr. Barker, 'do you know you owe me $1,000?' and Mr. Barker replied, 'no,' and asked what it was for. Mr. Hawley said, 'in looking over my papers, a few days ago, I found an agreement, which said if the Dorchester property was not sold by April, 1867, that he, Mr. Barker, was to pay the sum called for, $1,000.' Mr. Barker replied that there was another agreement made after that, which said that if the property was not sold by April, 1867, that he, Barker, was to deed the property back to Hawley. Hawley said that was his understanding of the thing, and never knew any thing to be different until he found the agreement. Barker asked Hawley if he had owed him $1,000, if he would not have called for it before. Hawley said, 'certainly I should, for I have been hard up.' This conversation was in September, 1873."

*Cross-examination:* "The contract referred to was a con-

tract made after the written contract mentioned by Hawley. I am now in the employ of W. J. Barker. I have related all of that conversation. Hawley did demand the $1,000 at the time I left. I then left, and heard no more of the conversation between them."

*Re-direct examination:* "I do not know how long Hawley and Barker remained in conversation after I left; they were in there together for fifteen minutes or longer after I left; I passed in and out while they were in the office, and saw them talking."

The defendant then gave in evidence the deposition of John L. Schellenger:

"I am a merchant; age thirty-nine; reside in Denver, Colorado. I resided in Gilpin county, from August, 1860, to April, 1861; then from June, 1862, to April, 1873; I know the parties to this suit; have known Mr. Hawley between twenty-five and thirty years; have known Barker about ten years; I prepared the paper marked, "Exhibit A," attached to my deposition, at the request of Mr. Hawley, on the 11th day of March, 1869; Hawley requested me to make out a deed to an undivided one-sixth interest of claims five, six and seven, east of Discovery on the Dorchester lode, and an undivided one-sixth interest to Discovery claim, and claim number one, on the Columbus lode; he told me to prepare it, take it to Mr. Barker, and have him sign it; that Mr. Barker had agreed to do so, or pay him, Hawley, $1,100, I think it was, and as the money had not been paid he wanted a deed to the property, and I prepared the deed according to his request; on the 11th of March, 1869, I presented said deed to Mr. Barker and wife, his signature, and they signed it in my presence, and, after signing it, Mr. Barker handed it to me; he and his wife acknowledged the same; Barker then asked me if Mr. Hawley sent a note of his for $60, by me to hand to Mr. Barker; I told him no, that I had no such note; Mr. Barker then requested me to leave the deed with him, stating that he would see Mr. Hawley and get his note, and then hand

the deed to Mr. Hawley; I then left, and left the deed with
Mr. Barker; I reported to Mr. Hawley on the 11th day of
March, 1869, the conversation had with Mr. Barker, and
Hawley said 'all right, I'll see Mr. Barker,' or words to
that effect; I was paid for my services; I think by Mr.
Hawley; he said he would pay me, and I think he did
with a settlement afterward had with him; at the time I
reported to Hawley what Barker said, I don't remember
that any thing was said about any indebtedness due from
Hawley to Barker as an offset to the note."

*Question.* Interrogatory 10. "Do you remember having
any conversation with Hawley about the year 1865 or 1866,
while Mr. Barker was east trying to sell the property men-
tioned in said deed, as to what Mr. Barker had agreed to
pay him, Hawley, in case he sold said property; if so,
state fully all that was said by Hawley in regard to the
same?".

*Answer.* "I remember of having a conversation with Mr.
Hawley about that time; during the conversation he, Haw-
ley, stated that Mr. Barker had agreed that on the sale of that
mining property, that he, Barker would pay him, Hawley,
one-sixth of the amount sold for; understood the amount
to be $30,000, of which Hawley was to receive $5,000; he,
Hawley, said he was satisfied that he would get the $5,000,
if the property was sold for $30,000; have had several con-
versations with Hawley, all of the same substance; we
have been very intimate; have known each other since we
were boys."

*Cross-examination:* "After the 11th of March, 1869, I first
saw the deed in full of 1873, in Mr. Barker's possession; he
presented the deed to me for the purpose of getting my
notarial seal attached to the acknowledgment, which had
not been done up to that time; I don't know whether the
deed was stamped or not on the 11th of March, 1869; I
don't know whether the deed was ever delivered to Hawley
or not."

*Re-direct examination :* " The acknowledgment was taken on the 11th of March, 1869 ; I did not affix my notarial seal to the certificate at the time, because my office was at Central City, and Barker resided at Black Hawk, and I did not have the seal with me when the acknowledgment was taken ; the deed was signed and acknowledged at his house; I was authorized to accept a delivery of the deed for Mr. Hawley."

*Re-cross examination :* " I did not return it to Mr. Hawley because I was requested by Mr. Barker to leave it with him until he, Barker, and Hawley had settled, he, Barker, remarking that he would see Hawley in a few days."

Here follows "Exhibit A," which is a deed dated the 11th day of March, 1869, between William J. Barker and R. C. Barker, his wife, of the first part, and Henry J. Hawley, of the second part, in and by which the parties of the first part convey to the party of the second part certain mining property, situate in Gilpin county, Colorado, to wit: an undivided one-sixth interest of claims numbered five, six and seven, east of Discovery, on the Dorchester lode, and an undivided one-sixth interest of Discovery claim, and claim number one, east of Discovery, on the Columbus lode, situated near the Dorchester, all situated, lying and being in Russell mining district. Signed : William J. Barker and Rebecca C. Barker. Also, the acknowledgment signed by the witness, Schellenger, certifying that the deed was acknowledged on said day by Barker and wife.

Defendant then introduced as a witness in his behalf, Eugene Drake, who testified : " I know the parties to this suit ; I know the Dorchester lode, and have known it since 1863 or 1864 ; I worked on it; we leased it from Barker and Hawley, three claims, five, six and seven, east ; leased it two years ago, in March or April; my brother's name is Alonzo Drake ; he was with me in the lease ; Hawley was one of the persons who signed the lease ; Hawley first talked with us about the lease; we occupied the property about

forty days; my brother paid Hawley two dollars, all we made; the lease was in writing, for one year; I am not sure that Hawley signed it; I think I gave it back to Hawley; I told Hawley that we had given up the lease, soon after we quit working it, about the latter part of May, 1873; he had lease prepared and sent it to Denver for Barker to sign."

*Cross-examination :* "Hawley did not tell me that he had any interest in it; he said he would write to Mr. Barker; he did not say that he had any interest in it; my father and myself made a bargain for the lease; my brother also spoke to him; Hawley and my brother and myself signed it first, and then it was sent to Denver."

The defendant then introduced Lester Drake, who testified : "I am the father of Eugene Drake; I know the parties to this suit; I have known the Dorchester lode since 1863, or longer; I had a conversation with Hawley about the lease; I think Hawley showed me a lease; I was not satisfied with it; Hawley said he would send it back and see what Barker said; they got another lease and then they went to work; Hawley said he did not have much interest in it, but would be entirely controlled by Barker; I am not sure that he said what he claimed; he did nothing with us only through Barker; I supposed Hawley and Barker owned the property; I saw Hawley and Barker there; I had conversations with Barker, and he always claimed interest in it; I saw lease after it was signed by Barker and Hawley."

*Cross-examination :* "Barker had us draw some ore for him four or five years ago; Barker was understood to be an owner since 1865; he had nothing to do with us regarding the hauling of the ore; Barker wanted to test it; Hawley said he would be entirely controlled by Barker; I was down at Denver and called to get lease from him of property, for boys."

Thereupon the said defendant offered in evidence, which was received and read to the jury, a letter written by the

said Hawley, to the said Barker, which was in words and figures following, to wit:

"CENTRAL, *March* 7, 1873.

WM. J. BARKER, *Denver, Col.:*

Dear Sir—The Drake boys from Lake Gulch are very anxious to get a lease on the Dorchester for one year. They urged me to make them a proposition, which I did verbally, which was for them to pay us 10 per cent of the gross proceeds from the mine, allowing them one month for repairs, hoisting water, etc. Also shaft to be sunk so many feet (no number mentioned) per month. I have not agreed to the above proposition, therefore nothing binding. Should be pleased to hear from you by return mail. Please state terms, etc., if you think best to let them have it.

Their names are A. B. and L. E. Drake. They told me to say that they could get $20 per ton for the ore if near Georgetown.

Resp. Yours,
(Sig.)   H. J HAWLEY."

Thereupon said defendant was duly sworn as a witness in his own behalf, and testified as follows: "I am defendant in this suit; I know the property, the Dorchester lode, and have known it since 1863 or 1864; (here the instrument sued on was shown to the witness) in the fall of 1865 I purchased the property on the Dorchester lode, parts of claims five, six and seven; I took power of attorney for the undivided one-half of five, when money, $1,000, was deposited; Hawley was to make deed to me; before the time expired he was paid the $1,000; he gave me a warranty deed for the undivided half of number five, east, on the Dorchester lode; I left for the east to spend the winter and to make sale of the property, in the fall of 1865; I returned in the spring of 1866; the property was worked while I was gone; I had, as I supposed, nearly perfected a sale of the Dorchester property, for $30,000; I corresponded

with Hawley while I was gone; he asked me to give him one-sixth of what property would sell for, instead of the $1,000 I had paid him; he urged me and I granted this request; he said $25,000 would be a good start for me, and $5,000 would be for him; I did not perfect the sale; I returned in May, 1866; sometime after he said he ought to have something to show he had paid me $1,000, and I gave him the document that is here; I paid him $1,000, he paid it back, and I gave an agreement to give him one-sixth of the proceeds of the sale; afterward he said he did not like the way the agreement was drawn, as after April he would be obliged to receive the money named in the agreement, instead of property, as agreement called for; I asked him what he wanted; he said it was worth two or three thousand dollars at least; I think the last agreement was made thirty to sixty days after the first; I drew up an agreement and took it to Hawley; I have not seen it since; I kept no copy of it, nor did I of this agreement; I have heard Hawley's testimony; I had no conversation with him about paying ten per cent interest; I told him several times I would make deed to him for it; I never had any conversation in which I agreed to pay $800; I have not since that time agreed to pay it, nor has he demanded it, as he always claimed interest in the property; he had my note for $60; he owed $111 for work; $1,000 was the price of the property; $136 for work on the lode; I bought Columbus lode for $100; last amount paid for work was $669.98, on April 15, 1867; one-sixth was $113.32, on last amount paid; a credit of $60 was allowed, leaving balance due me, $51.66; he said he would pay, at different times, once in thirty, once in sixty days; in 1869. Schellenger presented me warranty deed, and I signed it, and had a conversation with Schellenger, as he, Schellenger, states; I saw Hawley a few days afterward, and told him he did not send down note; he said no, he had not balance to send with it; when going to Denver I told Hawley I wanted to settle up our business before I went; I had considerable conversation about it; he said, 'you ought to forgive me that debt, and give me deed;' I ob-

jected, but afterward assented; he said, 'who will pay for recording?' I said, 'you will;' he said, 'no, I would hardly pay for recording for the property;' he said, 'you can place it on record whenever you want to pay for recording;' I saw him several times, and would laughingly ask about the recording of that deed; in 1873 he came to my place of business and said, 'Barker, do you know you owe me about $1,000?' I said, ' what for?' he said, ' for Dorchester mine;' he said, in looking over papers he found an agreement that I was to pay him $1,000 if the property was not sold; I told him there was a subsequent agreement; he said he thought so too; he said, 'I did not know you owed me until I found that agreement; I supposed that the property was to be deeded back;' during this time, March, 1873, a lease was made by us to the Drake boys; I told him there was another agreement; he said he thought so too, and would look for it; when he returned he admitted there was another agreement, if not lost; I have not at any time, since April, 1866, or 1867, admitted, or agreed, or promised, to pay this amount."

*Cross-examination:* "The subsequent agreement was made about thirty or sixty days after the first; I think I wrote it; it was written at his request; he said, if the property was not sold by April, 1867, he would be obliged to take $1,-135; and he would rather have the property deeded to him than to have the money; we made a new contract; I think this is all the difference; the second contract provided that the property should be deeded to him if not sold; he said if the property was not sold he wanted it; was worth so much more; the deed was in my possession in 1871; I had it in my possession when I came up and saw him; I don't remember conversation about paying interest to Hawley; I never had such conversation; I never promised to pay him since 1873; I called on Hawley, and said I regretted having a lawsuit; I said, 'I will purchase your interest in the Dorchester lode; we will not talk compromise;' the deed attached to Schellenger's deposition I had with me

that day, or the next after it was made; Hawley requested me to hold it until he could pay the balance; I kept it until the fall of 1873, and then did as he requested, paid for recording and put it on record; the deed was delivered to Hawley; I handed it to him one day, in my office in Denver, in October, 1873; he said he did not know as he could accept it; would have to see Mr. Teller first; he left it there."

*Re-direct examination:* "Since 1864, up to the present time, I have been able to pay any amount I owed."

Defendant rested.

The plaintiff, by way of rebuttal, introduced the said Henry J. Hawley, who testified: "I heard Mr. Barker's testimony about subsequent agreement; I am positive there was no subsequent agreement; I have never seen it; the deed was never tendered me until October, 1873; I refused to take it, on the ground I stated to him; I wanted the money; Barker was to pay for recording the deed; he was to pay for making the deed to Schellenger; he did not send it back; I don't remember his offering me the deed until October, 1873; I am quite positive about that; I had no conversation that I remember of, about the deed to mine, from that time until 1873; when lease was made to Drake boys, I did not claim any interest in the property; I did not make any admission of subsequent agreement, and told him so at Denver; I am positive that no such agreement was made; told him if he would show any such agreement, I would admit it."

*Cross-examination:* "I don't remember of making any promise to search for subsequent agreement; in 1867, 1868 and 1869, I did not claim an interest in the property; I claimed the agreement as so much money; I did not claim any interest in the property; I do not think I did; Drake knew I had owned property from letter, 'to pay us ten per cent of proceeds;' they wanted us to sign the lease; they

paid us $2 ; Barker got no part of it ; I had conversation about the time Barker went to Denver ; he said he had done considerable work on the mine."

The foregoing was all the evidence in the case as appears by the record. It was stipulated by counsel, in the court below, that exception might be entered of record *nunc pro tunc* to the overruling of the motion for a new trial.

Messrs. BUTLER & WRIGHT, for appellant.

Messrs. H. M. & W. TELLER, for appellee.

ELBERT, J. The only error insisted upon by counsel in argument is that the verdict of the jury was manifestly against the evidence, "the instructions of the court and the law of the case."

This court and the Territorial supreme court have repeatedly ruled that "when the evidence is conflicting and the verdict is not manifestly against the weight of evidence, the verdict will not be disturbed. *Taylor v. Randall*, 3 Col. 400; *Machette v. Wanless*, 2 id. 169; *Walling v. Warren*, id. 434; *Fisher v. Martin*, id. 525; *Martin v. Hazard Powder Co.*, id. 601; *Hall v. King*, id. 711; *Murphy v. Cunningham*, 1 id. 467; *Mather v. Glines*, id. 472; *Smith v. Cisson*, id. 29.

In the case of *Walling v. Warren*, *supra*, it was held that where the plaintiff and defendant contradict each other upon the stand, and neither of them is supported by other testimony, the verdict will not be disturbed.

Upon the matter of a new promise, Hawley testifies to a conversation with Barker in April or May, 1868, in which Barker promised to pay him interest on the note. This would necessarily involve a recognition of the existence of the principal indebtedness and a promise to pay it.

Barker denies that any such conversation was had. Neither was corroborated and the jury were the judges of the credibility of the witnesses.

Upon the matter of a new and substituted contract, Hawley testifies there was a verbal agreement that "if I would send

Mr. Schellenger to Black Hawk and Barker executed a deed to me for certain property, I would give him a certain note." This statement of the terms of the subsequent contract is corroborated by the testimony of Mr. Schellenger. He says "he (Hawley) told me to prepare it (the deed), take it to Mr. Barker and have him sign it—that Mr. Barker had agreed to do so, or pay him, Hawley, $1,100, I think it was, and as the money had not been paid, he wanted a deed to the property."

Barker in substance testifies to an unconditional agreement upon the part of Hawley to receive a deed for the property, in satisfaction of the agreement sued upon, without any alternative.

Barker is corroborated by Burnell who testifies, that in a conversation between Hawley and Barker in Barker's store in Denver, in September, 1873, that Barker claimed that there was another and subsequent agreement, which provided that if the property was not sold by April, 1867, that he, Barker, was to deed the property back to Hawley, and that Hawley said such was his understanding.

Here again the testimony of the plaintiff and defendant is conflicting, and each is corroborated by another witness.

After its execution in March, 1869, Barker retained the deed until October, 1873, when he tendered it to Hawley after Hawley had demanded the money in September.

The evidence respecting the acceptance of the deed is conflicting, but the preponderance we think is that Hawley refused to accept it. Hawley so testifies.

Barker testifies that Hawley agreed to accept if he would pay the fee for recording, but admits that when he tendered him the deed in October, 1873, Hawley said "he did not know if he could accept it—would have to see Mr. Teller first."

Neither is corroborated.

The verdict of the jury involves their finding that there was no acceptance and without acceptance no title passed. There was no compliance with the terms of the substituted agreement, if there was one.

The testimony of the two Drakes, and Hawley's letter to Barker respecting the lease to them, prove nothing certain or definite respecting the relation which Hawley at that time sustained to the property. There is that which indicates him as the owner ; there is as much or more that indicates him an agent.

The case is clearly one for the application of the rule that when the evidence is conflicting and the verdict is not manifestly against the weight of evidence, the verdict will not be disturbed. As was said in the case of *Taylor v. Randall, supra,* " It was the province of the jury that tried the cause, as the evidence was so contradictory as to be impossible of reconciliation to determine to whom credit should be given. They are the proper judges of the weight of evidence and the credibility of witnesses. Sitting as an appellate court, we must assume the truth to be with the evidence which upholds, and not with that which assails the verdict, unless the weight of evidence very strongly preponderates against it. It is not enough that had the verdict been different, this court would not have disturbed it."

The judgment of the court below is affirmed with costs.

*Affirmed.*

Dissenting opinion of Stone, J. I regret that the only fixed conclusions which I have been able to arrive at upon the evidence in this case impel me to dissent from those reached by my brethren on the bench, and I have therefore felt it important to preface my reasons with reciting the material portions of the evidence and other parts of the record.

Plaintiff sued upon the following instrument :

"Received of H. J. Hawley eleven hundred and thirty-six dollars ($1,136) in full payment of one-sixth part of lode mining claims, five (5), six (6) and seven (7) east from the discovery on the Dorchester lode, situated in the Russell mining district in Gilpin county, Colorado, which one-sixth of above-mentioned claims I am to hold and endeavor to make a sale of the same, and in case I make a sale, I am to

pay to said Hawley whatever amount I receive, less the expenses incurred in making such sale, and any time after April 1st, 1867, should the said Hawley so desire and demand of me, I agree to refund and pay to him the above-named sum of $1,136, and when such payment is so made said above-described property is to revert back to me.

              (Signed)                          WM. J. BARKER.
BLACK HAWK, Colorado, *June* 18, 1866."

Defendant plead the general issue, the statute of limitations, and special pleas setting up a subsequent contract to deed back the property in lieu of the money mentioned in the instrument declared on.

So much of the evidence as is pertinent to the issue was as follows:

The plaintiff testified in substance: I made a demand on the defendant for the money in April or May, 1868; told him I ought to have the money, or the same rate of interest on it that I was paying; he said he would allow me ten per cent interest; conversation occurred at his place of business; no one present but ourselves; do not know when we next talked; as late as 1870; two or three years intervened between the first and the next conversation; the agreement is in defendant's handwriting; he acknowledged it at different times; in September, 1873, I think I had conversation with defendant about it in Denver; was in his store; cannot recollect all the conversation; I made demand for the money; he asked why I had not made demand before; think I told him I did not think I could collect it; he lived at Black Hawk and I at Central; there was a verbal agreement, that if I would send Mr. Schellenger to Black Hawk, and Mr. Barker would execute a deed to me for certain property, I would give him a certain note; Mr. Schellenger did not bring back the deed; I sent him down there and gave instructions about the deed; my recollection is not very clear, but I tried to get back same property that I sold, being the undivided one-sixth of three hundred feet

of the Dorchester lode; may be the claims five, six and seven east, I am not certain though; the amount was $1,136; $1,000 on account of the purchase of the property and $136 for work on the same; I don't know that he ever promised to pay it; he only promised to pay interest; never denied or refused to pay it. (The instrument sued on was here introduced.) I had a conversation with Barker regarding this instrument; I wanted to know what he was going to do about it; he said he would pay me something on it; I believe he offered to pay it one time; said he would pay me $800; this was soon after it was due in 1867, I think he had given up trying to sell the property; I told him I would not take $800; I told him I would take the property back if he would deed it to me, but don't know that it was the same conversation; think I had other conversations." The plaintiff rested here and the defendant gave in evidence the deposition of Frank A. Burnell, who. testified: "I heard a conversation between Barker and Hawley in Barker's store in Denver; Hawley said to Barker, 'do you know you owe me $1,000?' Barker replied 'No,' and asked what it was for; Hawley said 'in looking over my papers a few days ago, I found an agreement which said, if the Dorchester property was not sold by April, 1867, that he, Mr. Barker, was to pay the sum called for, $1,000;' Barker replied 'that there was another agreement made afterward, which said that if the property was not sold by April, 1867, he, Barker, was to deed the property back to Hawley;' Hawley said 'that was his understanding of the thing, and he never knew any thing different until he found the agreement;' Barker asked Hawley 'if I had owed you $1,000, would you not have called for it before;' Hawley said, 'certainly I should, for I have been hard up;' this conversation was in September, 1873; Hawley demanded the $1,000; I am in the employ of Barker."

John L. Schellenger, in his deposition, testifies: "I have known Hawley since we were boys; I made out the deed March 11, 1869, at request of Hawley, to the undivided one-

sixth interest of claims five, six and seven east of discovery on the Dorchester lode, and one-sixth interest in discovery claim and claim number one on the Columbus lode; he told me to prepare it and take it to Barker, and have him sign it; that Barker had agreed to do so or pay him $1,100, I think it was, and as the money had not been paid, he wanted a deed to the property; I prepared a deed according to his request, on the 11th of March, 1869, and presented it to Barker and his wife for signature, and they signed it in my presence, and, after signing it, Barker handed it to me; he and his wife acknowledged the same; Barker then asked me if Hawley had sent a note of his for $60, by me to hand to him; I told him no; Barker then requested me to leave the deed with him, stating that he would see Hawley and get the note, and then hand him the deed; I left the deed with Barker and reported the conversation to Hawley the same day, and Hawley said 'all right, I'll see Mr. Barker,' or words to that effect; Hawley paid me for my services; I saw the deed afterward in the fall of . 1873, in Barker's possession; he presented it to me for the purpose of getting my notarial seal attached to the acknowledgment, which had not been done up to that time; the acknowledgment was taken on the 11th of March, 1869; I did not attach my seal to the certificate at the time because I did not have it with me; my office was at Central, and the deed was signed and acknowledged at Barker's house, at Black Hawk; I don't know whether the deed was ever delivered to Hawley or not; I was authorized to accept a delivery of the deed for Hawley."

The deed introduced is as described by Schellenger.

The testimony of the two Drakes is to the effect that in 1873 they leased the property in question from Hawley and Barker; that both claimed an interest in it, and both signed the lease; that the rent was paid to Hawley.

A letter was introduced written by Hawley to Barker, respecting the proposition to lease to the Drakes, in which Hawley says: "They urged me to make them a proposi-

tion, which I did verbally, which was for them to pay us ten per cent of the gross proceeds from the mine," etc.

The defendant Barker testified: "In the fall of 1865, I purchased the property on the Dorchester lode; parts of claims five, six and seven; I took a power of attorney for the undivided half of five; when the money, $1,000, was deposited, Hawley was to make deed to me; before the time expired he was paid the $1,000, and gave me a deed for the undivided half of number five on the Dorchester lode; I went east to make sale of the property in the fall of 1865, and returned in the spring; I had, as I supposed, nearly perfected a sale of the Dorchester property, for $30,000; I corresponded with Hawley while I was gone; he asked me to give him one-sixth of what the property should sell for, instead of the $1,000 I had paid him, and I agreed to this; I did not perfect the sale and returned in May, 1866; sometime after he said he ought to have something to show that he had paid me $1,000, and I gave him this document (the instrument sued on); he paid back the $1,000, and I made the agreement to give him one-sixth of the proceeds of the sale; afterward he said he did not like the way the agreement was drawn, as after April he would be obliged to receive the money named in the agreement, instead of the property as the agreement called for; I think the last agreement was made thirty or sixty days after the first; I made an agreement and took it to Hawley; I have not seen it since, and kept no copy of it or of the other; I have heard Hawley's testimony; I had no conversation with him about paying ten per cent interest; I told him several times I would make a deed to him; I never had any conversation with him in which I agreed to pay him $800; I have not since that time agreed to pay it, nor has he demanded it, as he always claimed an interest in the property; he had my note for $60; he owed me $111 for work; $1,000 was the price of the property; $136 for work on the lode; the last amount paid for work was $669.98, April 15, 1867; one-sixth was $113.32; a credit of $60 was

allowed, leaving a balance due me of $51.66 ; he said at different times, he would pay.

In 1869, Schellenger presented me a warranty deed and I signed it, and had a conversation with Schellenger as he testifies ; I saw Hawley a few days afterward, and told him that he did not send down the note ; he said no, that he had not the balance to send with it; when going to Denver, I told Hawley I wanted to settle up our business before I went ; we had considerable conversation about it ; he said you ought to forgive me that debt, and give me deed ; I objected, but afterward assented ; he said, 'who will pay for recording,' I said, 'you will,' he said, 'no, I would hardly pay for recording for the property' ; he said, 'you can place it on record whenever you want to pay for recording' ; I saw him several times and laughingly asked him about the recording of that deed ; in 1873, he came to my place of business in Denver, and said, 'Barker, do you know you owe me about $1,000,' I said, 'what for?' he said, 'the Dorchester mine;' he said in looking over papers he found an agreement that I was to pay him $1,000, if the property was not sold ; I told him there was a subsequent agreement ; he said he thought so too ; he said, 'I did not know that you owed me until I found that agreement, I supposed the property was to be deeded back;' I told him there was another agreement ; he said he thought so too, and that he would look for it; when he returned he admitted there was another agreement, if not lost; I have not at any time since April, 1866 or 1867, admitted or agreed or promised to pay this amount.

The subsequent agreement was written at his request. He said if the property was not sold by April, 1867, he would be obliged to take $1,135, and he would rather have the property deeded to him than to have the money. We made a new contract; this is all the difference. The second contract provided that the property should be deeded to him if not sold. Hawley requested me to hold the deed until he could pay the balance. I kept it until the fall of

1873, and then did as he requested, paid for the recording and put it on record. The deed was delivered to Hawley. I handed it to him one day in my office in Denver, in October, 1873. He said he did not know as he could accept it; that he would have to see Mr. Teller first; he left it there."

Hawley in rebuttal testified :

"The deed was never tendered me until October, 1873. I refused to take it on the ground I stated to him, I wanted the money. Barker was to pay for recording the deed. When the lease was made to the Drake boys I did not claim any interest in the property. There was no subsequent agreement. I am positive of this, and did not make any admission of such subsequent agreement. I do not remember of making any promise to search for a subsequent agreement. I told him if he would show such agreement, I would admit it. I did not claim any interest in the property in 1867, 1868, and 1869. I do not think I claimed any interest in the property. Drake knew I had owned the property from my letter "to pay us ten per cent of the proceeds." They wanted us to sign the lease. They paid us $2.00. Barker got no part of it. I had a conversation about the time Barker went to Denver; he said he had done considerable work on the mine."

The court, of its own motion, gave the jury the following instruction :

"Upon an examination of the instrument sued upon, it shows in the judgment of the court that more than six years have elapsed since the cause of action accrued to the plaintiff, and is therefore barred by the statute of limitations, and if the plaintiff recover it must be upon a new, subsequent promise or acknowledgment of the existence of the pre-existing debt, upon which the law will imply a promise; and the burden of proof is upon the plaintiff to show such promise or acknowledgment. If you believe, from the evidence, that a subsequent agreement was entered into between the parties, relating to the same subject-matter, by which the money part of this agreement was omitted, and a deed

was to be executed to certain property in the agreement mentioned, and in pursuance thereof the deed was executed in accordance with such agreement, then the plaintiff cannot recover upon this instrument and your verdict should be for the defendant. If you find for the plaintiff, your verdict will be "we, the jury, find for the plaintiff and assess his damages at    . If for the defendant, "we, the jury, find for the defendant."

The court also upon motion of the defendant gave the jury the following instruction:

"The court instructs the jury that the instrument dated June 18, 1866, which has been received in evidence, was barred by the statute of limitations before this suit was brought, and no recovery can be had upon the same, unless the defendant, within six years before the bringing of this suit, made a new promise, and the burden of that proof rests upon the plaintiff and not upon the defendant. The plaintiff must recover upon the preponderance of testimony. If the plaintiff claims the right to recover upon a new promise alleged to have been made by the defendant, and the testimony upon that point is so conflicting that the jury cannot determine whether such a promise was made or not, they must find for the defendant."

The foregoing are all the instructions given. Neither of these instructions were excepted to. The jury found a verdict for the plaintiff in the sum of $1,136.

There was a motion for new trial by defendant, on the ground that the verdict was against the evidence and the law of the case, which motion was overruled and exception taken.

The principal errors assigned are, that the verdict was manifestly against the evidence and the instructions of the court, and in that the court erred in overruling the motion for a new trial.

Upon the evidence and under the instructions of the court, which were certainly not misleading, I fail to see how

the jury should have found the verdict for the plaintiff which they did.

*First.* It must be admitted that the written contract sued on was, at the time of bringing the suit, barred by the statute of limitations, which was specially pleaded in the case. Nor do I think the evidence proves a new promise by the defendant at any time within six years next before the commencement of the suit, to pay any sum of money to the plaintiff upon any obligation arising out of the contract sued on. The only evidence of such promise is the testimony of the plaintiff himself, where he states that in April or May, 1868, he made a demand for the money, telling the defendant he ought to have the money or interest on it, and that the defendant then said, " he would allow ten per cent interest;" and upon re-direct examination he says: "I don't know that he (Barker) ever promised to pay it; he only promised to pay interest."

This evidence is flatly contradicted by the testimony of the defendant. Here, then, these two contradictory statements under oath stand against each other. Without any corroborating evidence on his part, can it be said that the plaintiff has made out his case?

Upon his cross-examination, the plaintiff, upon this point, further says: "I made demand for the money; he asked me why I had not made demand before; I think I told him that I did not think I could collect it; I did not think the defendant was insolvent; I did not think I could make it on execution."

The admission that the defendant asked him why he had not demanded the money before may, I think, be fairly taken, in connection with the testimony of both parties upon this point, to imply that the defendant was surprised at the demand being made, and had not reason to expect it. The reason given by the plaintiff, that he did not think he could collect it by execution, does not appear to be a very satisfactory one, inasmuch as when a creditor has ground for surmising that he cannot recover a claim by

law, he naturally makes a demand all the more promptly in hopes that the debtor will accede to the demand voluntarily.

While this may be regarded as a small grain of evidence to corroborate the testimony of the defendant, it yet seems to me sufficient to turn the scale, and forbid the conclusion that the plaintiff has established the making of a promise to pay within the time limited by the statute.

*Second.* If a subsequent contract was entered into by the parties, whereby it was agreed that defendant should deed back to plaintiff the property in lieu of the money that by the first agreement was to be paid therefor, then the plaintiff was not entitled to recover even though he had established a former valid promise to pay the money under the first agreement.

That there was such a subsequent agreement thereby rescinding the former one, appears to me quite conclusive by a fair preponderance of evidence.

The plaintiff himself testifies : " There was a verbal agreement that if I would send Mr. Schellenger to Black Hawk, and Barker executed a deed to me for certain property, I would give him a certain note." This statement taken alone is calculated to convey the idea that the " certain property " here referred to was other than the property in controversy, and that the " certain note " to be given was for the purchase-price. Upon further cross-examination plaintiff says : " Schellenger prepared the deed; I suppose I gave instructions regarding the deed ; my recollection is not very clear, but I tried to get some property back that I sold, being the undivided one-sixth of three hundred feet of the Dorchester lode ; may be the claims five, six and seven east ; I am not certain though."

This rather striking vagueness and want of recollection about the transaction has an air of pretense and evasion, notwithstanding which the witness does admit that he *tried to get back the property that he had sold.*

But Mr. Schellenger makes perfectly clear the transaction

not only respecting the property deeded back to plaintiff, but as to the "certain note" referred to by plaintiff which he was to give to Barker. This witness says : " I made out the deed March 11, 1869, at the request of Hawley to the undivided one-sixth interest of claims five, six and seven east of discovery on the Dorchester lode, and one-sixth interest in discovery claim and claim number one on the Columbus lode; he told me to prepare it and take it to Barker and have him sign it, that Barker had agreed to do so or pay him $1,100, I think it was, and as the money had not been paid he wanted a deed to the property." After testifying to the execution of the deed and its being by Barker handed to witness, Schellenger further says : " Barker then asked me if Hawley had sent a note of his for $60 by me to hand to him ; I told him no ; Barker then requested me to leave the deed with him, stating that he would see Hawley and get the note and then hand him the deed; I left the deed with Barker, and reported the conversation to Hawley the same day, and Hawley said its all right, I'll see Mr. Barker, or words to that effect."

The note referred to by plaintiff in his testimony above, to be "given" to Barker upon execution of the deed, was clearly this $60 note, and which was altogether outside of the main transaction respecting the reconveyance of the property in question. This is still further explained by Barker in his testimony wherein he says :· "He (Hawley) had my note for $60 ; he owed $111 for work ; $1,000 was the price of the property ; $136 for work on the lode ; I bought the Columbus lode for $100 ; last amount paid for work was $669.98 on April 15, 1867 ; one-sixth was $113.32 on last amount paid ; a credit of $60 was allowed, leaving a balance due me of $51.66 ;    *    *    * in 1869 Schellenger presented me a warranty deed, and I signed it, and had a conversation with Schellenger as he states ; I saw Hawley a few days afterward and told him he did not send down note ; he said no, he had no balance to send with it." It thus appears that the $60 note was to be given up to Barker in

adjustment of an outside or separate account between the parties.

In proof of the subsequent agreement to reconvey the property to Hawley, in place of the payment of the original purchase-price, the plaintiff admits that he tried to get back the property in question, because the money had not been paid for it; that he told Barker he would take back the property if he would deed it to him, and that he instructed Schellenger to prepare the deed for this purpose; while the testimony of Schellenger, as well as that of the defendant and the witness Burnell, is decisive on this point, and that the deed was executed accordingly.

*Third.* A question is made as to the complete delivery of the deed, and this, it seems to me, is the only question upon which it is possible to make the decision in affirmance of the judgment, turn. True, the evidence shows that at the last moment, Hawley refused to receive the deed, acting under the advice of counsel. But if there was any thing lacking in respect to a complete *actual* delivery, it was solely because Hawley then refused to receive it, and not that there had been no offer to deliver it, for that it was tendered is testified to by Barker, who says: "I handed it to him one day in my office in Denver; * * * * he said he did not know as he could accept it; would have to see Mr. Teller first; he left it there." The only explanation offered as to the non-delivery and record of the deed, from the time it was executed, in 1869, to the fall of 1873, is given in the testimony of Barker, who says: "Hawley requested me to hold it (the deed) until he could pay the balance. I kept it until the fall of 1873, and then did as he requested, paid for recording and put it on record."

This delay, then, seems to have been as much the fault of Hawley as Barker, and was with the assent of both, and if it be true, and this is not controverted, that Barker, after some controversy as to who should pay for recording the deed, finally put it on record at the request of Hawley, the grantee, I am inclined to regard this, under all the circumstances, as a sufficient constructive delivery. Hence it fol-

lows that in place of the purchase-price of the property
originally agreed to be paid Hawley, he agreed to take back
the property; a deed for this purpose was made at his re-
quest, and after several years' delay, to which he assented,
the deed was placed upon record at his requst, so that the
legal title to the property has thereby become absolutely
vested in him, while by the judgment of the court he has
also recovered the original price.

I cannot agree that upon the evidence in the case the
plaintiff should be allowed to have the property in contro-
versy and the price of it also. To say that the property
was thrust upon him against his will, and that therefore the
defendant cannot be heard to complain, is to decide the
very question upon which this whole branch of the case
hinges; and upon this point I am forced to conclude that
the agreement to take back the property, as between the
plaintiff and defendant, was fairly carried out. The whole
transaction seems to have been conducted rather loosely on
both sides, and while I do not undertake to pronounce upon
the *equities* of the case, I cannot be unconvinced that upon
the issues joined in the suit, the evidence does not support
the verdict rendered by the jury in the case. While it has
been repeatedly held in this court that a verdict will not be
disturbed where the evidence is conflicting merely, or de-
pends on the degree of credibility to be given the respective
witnesses by the jury, or where the plaintiff and defendant,
as witnesses, contradict each other, and there is no other
evidence in the case (*Murphy* v. *Cunningham*, 1 Col. 467;
*Mathews* v. *Glines*, id. 472; *Machette* v. *Wanless*, 2 id.
169; *Walling* v. *Warren*, id. 434); yet where the verdict is
clearly and manifestly against the evidence, it should be
set aside in furtherance of justice. *Keating* v. *Pedee*, 2 Col.
526; *Martin* v. *Hazard Powder Co.*, id. 601.

I think this is a case that comes within the latter rule.
There is shown, in my opinion, not merely a want of pre-
ponderance of evidence, but lack of proof on behalf of the
plaintiff to reasonably support the verdict upon the issues
joined in the case.